**SO ORDERED.**

**SIGNED this 07 day of July, 2011.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

| | |
|---|---|
| **IN RE:** | |
| | **CASE NO. 09-09124-8-JRL** |
| **ROBERT V. RODGERS,** | |
|     **DEBTOR.** | **CHAPTER 13** |
| | |
| **ROBERT V. RODGERS,** | |
|     Plaintiff, | |
| | |
|     vs. | **ADVERSARY PROCEEDING** |
| | **NO.   10-00171-8-JRL** |
| **PREFERRED CAROLINA REALTY, INC., JAMES E. ALLEN, JR., JIM ALLEN GROUP, INC., HARRY JAMES THORPE, RANDALL EICHORN, LISA EICHORN, W. SIDNEY ALDRIDGE, and NICHOLLS & CRAMPTON, P.A.,** | |
|     Defendants. | |

## ORDER

This matter came before the court on certain defendants' motion for judgment on the pleadings.  A hearing was held on June 16, 2011, in Raleigh, North Carolina.  Defendants W. Sidney Aldridge and Nicholls & Crampton, P.A. (collectively "Aldridge") move for judgment on the pleadings in their favor on the allegations of abuse of process, persistence in nonjusticiable claims, infliction of emotional distress and fraudulent practices by attorneys.

## STATEMENT OF FACTS

1. In December 2005, Randall and Lisa Eichorn ("the Eichorns") sought to purchase a new home.

2. The Eichorns entered into an exclusive agency relationship with Preferred Carolina Realty, Inc. ("PCR") and James E. Allen, Jr. ("Allen") to represent them as buyers in their search for a new home.

4. On or about December 8, 2005, Harry James Thorpe ("Thorpe") and Allen, agents for PCR, showed the Eichorns property located at 7409 Oriole Drive, Wake Forest, North Carolina ("the property").

5. PCR represented to the Eichorns that the property was owned by Toth Building Company, who was performing construction on the property. The Eichorns executed a dual agency addendum to their agency contract with PCR, as PCR also represented the seller of the property.

6. Plaintiff Robert V. Rodgers ("Rodgers") hired Brandon Toth ("Toth") to oversee the construction of homes to be built on the property.

7. Rodgers was the actual owner of the property—not Toth Building as represented to the Eichorns by PCR.

8. The Eichorns, through PCR, entered into negotiations with Toth and Toth Building Company for the purchase of the property and the home to be constructed on the property.

9. On or about December 8, 2005, PCR presented a written contract for the purchase of the property to the Eichorns and for the construction of a home on the property by Toth Building. The parties signed the contract.

10. Unbeknownst to the Eichorns, PCR modified the contract by "whiting out" the name of the seller, Toth Building, and replacing it with Rodgers' name.

11. The contract provided for a purchase price of $502,500.00 and a closing date of April 14, 2006.

12. At this time, Rodgers had no knowledge of the contract, nor did PCR inform Rodgers of the sale contract.

13. In late December 2005, Toth informed Rodgers that there was an offer to purchase the property for $502,500.00.

14. Over the next few months, the parties—including Rodgers—discussed and negotiated additional construction on the property. Disputes arose regarding the quality of workmanship in the house and the additional construction, prompting Rodgers to demand an increase in the purchase price. The Eichorns would not agree to the increase.

15. Instead of closing on the sale of the property with the Eichorns, Rodgers put the property back on the market through PCR.

16. In early November 2006, the Eichorns, their retained counsel W. Sidney Aldridge of Nicholls & Crampton, P.A., Toth, and Allen met to finalize and execute an offer to purchase and contract for Rodgers' review.

17. The Eichorns informed Rodgers that if negotiations failed, the Eichorns would file a Notice of Lis Pendens against the property.

18. In January 2007, Rodgers informed the Eichorns that he had not accepted their offer, nor was there a valid contract for the sale of the property to them.

19. On March 12, 2007, Aldridge, as counsel to the Eichorns, filed a Notice of Lis Pendens against the property.

20. On July 12, 2007, the Eichorns closed on the sale of their then-current home.

21. On July 13, 2007, the Eichorns expected to move into their new home on the property; however, the house was not completed.

## PROCEDURAL HISTORY

1. On April 2, 2007, Aldridge, as counsel to the Eichorns, filed a complaint against Rodgers, PCR, Allen, Rodgers' business partner, Toth, and Toth Building Company, identified as Eichorn v. Rodgers, et al, Wake County Superior Court file number 07-CVS-3902.

2. The Eichorns only requested specific performance of the sale of the property to them.

3. Rodgers moved to dismiss the Notice of Lis Pendens on May 17, 2007, which was denied by Superior Court Judge Paul Ridgeway.

4. On August 31, 2007, Rodgers filed an amended answer, counterclaims and crossclaims against the parties. Rodgers later moved for summary judgment on all claims against him in the complaint, which was denied on April 3, 2008 by Superior Court Judge Leon Stanback.

5. On February 12, 2008, the state court ordered all parties to attend a mediated settlement conference.

6. On May 1, 2008, the parties entered into a settlement agreement. The terms of the settlement agreement were as follows:

a. PCR and Allen agreed to pay Rodgers $35,000.00 and waive any claim for a commission on the sale of the property.

b. The Eichorns agreed to purchase the property for $425,000.00 from Rodgers, subject to improvements made to the property and the transfer of clear title and with a closing date set for sixty days following the agreement.

c. Toth and Toth Building Company agreed to pay $15,000.00 to Rodgers.

d. All parties also agreed to file voluntary dismissals of all claims and counterclaims with prejudice and to execute a mutual release.

7. The settlement agreement was signed by the Eichorns as well as Aldridge.

8. On May 6, 2008, Rodgers' attorney notified the Eichorns, PCR, Allen and Toth that Rodgers did not want to settle the matter according to the terms of the agreement.

9. On May 8 and May 9, 2008, the Eichorns, PCR, and Allen each filed motions to compel compliance with and enforce the settlement agreement.

10. On July 3, 2008, Superior Court Judge Carl Fox ordered Rodgers to comply with the settlement agreement ("the 2008 Order"). The 2008 Order incorporated the settlement agreement by reference as if fully set forth.

11. Rodgers appealed the 2008 Order to the North Carolina Court of Appeals.

12. On February 25, 2009, the North Carolina Court of Appeals dismissed Rodgers' appeal.

13. Rodgers still refused to comply with the 2008 Order.

14. On May 13, 2009, the Eichorns again moved to compel Rodgers to comply with the 2008 Order.

15. On August 25, 2009, Judge Fox again ordered Rodgers to comply with the settlement agreement ("the 2009 Order"). It also specifically incorporated the terms of the 2008 Order.

16. Rodgers did not comply with the 2009 Order and filed a Rule 60 motion requesting relief from the 2008 Order and a Rule 59(a) motion to strike the 2009 Order.

17. On October 20, 2009, Rodgers filed a voluntary chapter 13 petition.

18. On June 14, 2010, this court entered an order lifting the automatic stay and allowing foreclosure on the property.

19. On July 29, 2010, Rodgers filed an adversary complaint against the state court parties. Among the allegations, Rodgers asserted claims of abuse of process, persistence of non-justiciable claims, infliction of emotional distress and fraudulent practices by attorneys against Aldridge.

20. This court dismissed the claims against PCR and Allen on December 3, 2010 on res judicata grounds, holding that the 2008 Order, which incorporated the terms of the settlement agreement, barred the claims against PCR and Allen. The claims against Jim Allen Group, Inc. and Thorpe were not dismissed because they were not parties to the original action.

## STANDARD OF REVIEW

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c) (incorporated into Federal Rules of Bankruptcy Procedure by

Fed R. Bankr. P. 7012(c)). The standard of review for a motion for judgment on the pleadings is identical to that of a motion to dismiss for failure to state a claim under Rule 12(b)(6). McDow v. Sours (In re Sours), 350 B.R. 261, 265 (Bankr. E.D. Va. 2006). Judgment on the pleadings is appropriate when there is "'no issue as to material fact and only matters of law remain.'" Id. (citations omitted). Similar to reviewing the pleadings in a motion to dismiss, the court reviews the pleadings of a motion brought under Rule 12(c) by accepting all of the well pleaded allegations in the complaint as true in the light most favorable to the non-movant. Id.

## DISCUSSION

Plaintiff asserts four claims against Aldridge including abuse of process, persistence of nonjusticiable claims, infliction of emotional distress,[1] and fraudulent practices by attorneys, to which Aldridge responds the plaintiff has failed to allege sufficient facts to assert these claims, among other arguments.

To state a claim for abuse of process, the plaintiff must assert that "(1) a prior proceeding was initiated against the plaintiff by the defendant or used by him to achieve an ulterior motive or purpose; and (2) once the proceeding was initiated, the defendant committed some willful act not proper in the regular prosecution of the proceeding." Semones v. Southern Bell Tel. & Tel. Co., 106 N.C. App. 334, 341 (N.C. Ct. App. 1992). The "willful act" of the second element must be an act that occurred subsequent to the issuance of process. Id. Aldridge argues he did not file the Notice of Lis Pendens and complaint against Rodgers with an ulterior motive, but even taking Rodgers' assertion that he did as true, Rodgers has not sufficiently pled the second

---

[1] It is unclear whether plaintiff has asserted a claim for intentional or negligent infliction of emotional distress. Both are discussed *infra*.

element of abuse of process. Rodgers argues the subsequent willful act committed by Aldridge was the use of the process to coerce Rodgers to give up the property pursuant to a sale contract that was never valid to begin with.

The court is not persuaded that Rodgers has sufficiently alleged the subsequent willful act required in an abuse of process claim. Rodgers relies on <u>Austin v. Wilder</u>, 26 N.C. App. 229 (N.C. Ct. App. 1975), for the proposition that the subsequent act in an abuse of process claim can be "when the plaintiff goes further and wrongfully perverts or abuses the processes of the court to coerce something for which the process was not intended." <u>Id.</u> at 233. Rodgers argues Aldridge used the Notice of Lis Pendens to prevent Rodgers from selling his property for a higher price or refinancing his construction loan, leading to his financial demise. However, the facts of <u>Austin</u> are distinguishable. In <u>Austin</u>, the plaintiff sued the defendants on account of a joint venture on the construction of an apartment complex for which the defendants owed the plaintiff money. <u>Id.</u> at 230. The parties executed a settlement agreement under which the defendants agreed to pay the plaintiff on a promissory note. <u>Id.</u> When the defendants failed to make payments on the note, the plaintiff sued again. <u>Id.</u> As a defense, the defendants responded that the original suit and lis pendens filed against them was an abuse of process in that the plaintiff wanted to cloud the title and prevent defendants from obtaining a construction loan that was pending approval. Without the loan, the defendants would be under financial duress and "'accede to [the plaintiff's] monetary demands.'" <u>Id.</u>

Here, the purpose of the Notice of Lis Pendens and litigation has always been to make Rodgers sell the property to the Eichorns. Even if maliciously instituted or brought without grounds, the process was issued for exactly what it was intended to do and nothing more—to

obtain specific performance of the sale.  In <u>Austin</u>, the subsequent act, separate from the issuing of process itself, was the attempt to block the pending loan and do further economic damage to the parties.

Rodgers' claim, if any, is brought more appropriately as one of malicious prosecution. The difference between an abuse of process claim and one for malicious prosecution is that the latter is based on malice in causing process to issue, while the former is based on improper use of process after it is issued.  <u>Barnette v. Woody</u>, 242 N.C. 424, 431 (N.C. 1955).  A claim for malicious prosecution exists where a proceeding against the plaintiff is instituted with malice and want of probable cause, the termination of which was in the plaintiff's favor.  <u>Best v. Duke University</u>, 337 N.C. 742, 750 (N.C. 1994).  Rodgers asserts the purchase contract was invalid from its supposed execution because the property was not Toth's to sell and that Aldridge knew this but proceeded with the Notice of Lis Pendens and complaint in state court regardless.  These allegations seem to fit malicious prosecution; however, because the matter was settled it did not exactly terminate in Rodgers' favor.  The resolution of the last element—termination in plaintiff's favor—is not necessary, because the three-year statute of limitations on a claim for malicious prosecution began with the filing of the Notice of Lis Pendens on March 12, 2007, and has since run.  <u>See</u> <u>Evans v. Chipps</u>, 56 N.C. App. 232, 235 (N.C. Ct. App. 1982) (citing N.C. Gen. Stat. 1-52(5)) (overruled on other grounds.).  This adversary proceeding was filed approximately three years and four months after the state court litigation was instituted.

Aside from the fact that Rodgers' abuse of process claim should fail for lack of a subsequent willful act, the premise for bringing the claim is not sound.  Rodgers harps on the allegation that Aldridge filed the state court litigation fully aware that the purchase contract was

invalid and that his clients had no grounds to tie up the property with the Notice of Lis Pendens. If the state court litigation was as baseless and malicious as Rodgers asserts, it would not have survived the motions to dismiss and for summary judgment in state court.[2] The initial motion to dismiss the complaint was denied a month after filing, and Rodgers' motion for summary judgment, filed a year later after discovery was again denied. Such a frivolous and vicious action would certainly have been rooted out after two levels of review by the Superior Court. Independently, this supports dismissal of this claim.

There are several issues with the remaining claims asserted against Aldridge. First, "persistence of nonjusticiable claims" is not an independent action recognized under North Carolina law. Rodgers cites North Carolina General Statute § 6-21.5 as the basis for this claim. Section 6-21.5 allows a prevailing party to recover attorney's fees where, after motion by the prevailing party, the court finds there was a complete lack of justiciable issues raised by the losing party in its pleadings. For example, a prevailing defendant could move for attorney's fees against a plaintiff who filed a complaint that completely lacked a justiciable issue of law or fact against him. This type of motion can also be brought at a later stage, such as when a defendant files a responsive pleading that also lacks justiciable issues, or after a consent order has been entered and a motion is then filed that is frivolous light of the settlement. Short v. Bryant, 97 N.C. App. 327, 329 (N.C. Ct. App. 1990). Although the statute provides a remedy for persistence in nonjusticiable issues, the motion is always raised in connection with an underlying

---

[2]This court is permitted to take judicial notice of public records, such as the orders denying the motion to dismiss and motion for summary judgment, without converting the pending motion to a motion for summary judgment. Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994).

action and only awards attorney's fees.  The statute does not create an independent claim.  Rodgers might have appropriately filed this claim in state court against the Eichorns, and if, thereafter, the court made findings that the Eichorns completely lacked any good faith argument of law, Rodgers could have recovered his reasonable attorney's fees spent litigating the state court action.  Rodgers cannot, in this separate adversary proceeding, assert a claim for persistence in nonjusticiable issues apart from the action in which he claims the persistence occurred.  The court suspects Rodgers is grasping for an alternative means of complaining of an abuse of process on the part of the Eichorns or their attorney, for which, as stated above, Rodgers has failed to sufficiently state a claim.

Next, the complaint fails to state a claim for either intentional or negligent infliction of emotional distress.  Both claims require the plaintiff to have suffered "severe emotional distress" and use the same standard in determining this element.  N.C. Index (4th ed.) Intentional Infliction of Emotional Distress § 3.  North Carolina law is abundantly clear in requiring that the victim have suffered "severe emotional distress" which is defined as any "'emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition that may be generally recognized and diagnosed by professionals trained to do so.'"  Holloway v. Wachovia Bank & Trust Co., N.A., 339 N.C. 338, 355 (N.C. 1994) (citations omitted).   No such condition or disorder has been alleged by Rodgers.   As to intentional infliction of emotional distress, Aldridge's conduct did not go "'beyond all possible bounds of decency,'" as is required for this claim.  Wells v. North Carolina Dept. of Correction, 152 N.C. App. 307, 322 (N.C. Ct. App. 2002) (citation omitted).  Filing litigation and exchanging stern words during the course of dealings does not approach this

standard. As to a claim for negligent infliction of emotional distress, the complaint does not allege a duty of care owed by Aldridge to Rodgers, nor does one exist between the two. Foster v. Crandell, 181 N.C. App. 152, 169 (N.C. Ct. App. 2007) (stating plaintiff must establish that defendant breached a duty of care owed to plaintiff).

Lastly, Rodgers has not sufficiently stated a claim for fraudulent practices by attorneys. Pursuant to North Carolina General Statute § 84-13, an attorney who commits a fraudulent practice is liable in an action to the party injured, and on the verdict passing against him, for double damages. Where a plaintiff fails to state a claim for fraud or constructive fraud, "no derivative claim for double damages arises under N.C. Gen. Stat. § 84-13." Wilkins v. Safran, 185 N.C. App. 668, 676 (N.C. Ct. App. 2007). Here, there is no claim for constructive fraud, nor could one stand because such a claim requires a breach of a fiduciary duty or relation of trust and confidence between Rodgers and Aldridge, and no such relationship exists between a party and opposing counsel. See Marketplace Antique Mall, Inc. v. Lewis, 163 N.C. App. 596, 599 (N.C. Ct. App. 2004). There is no viable claim for fraud because Rodgers has not alleged that he reasonably relied on Aldridge's statement. See, e.g., Sunset Beach Development, LLC v. AMEC, Inc., 196 N.C. App. 202, 208 (N.C. Ct. App. 2009) (listing reasonable reliance on the part of the plaintiff as an element of fraud). Since the commencement of the state court litigation, Rodgers has argued the sale contract with the Eichorns never existed—he stated this position in his counterclaim to the Eichorns' initial complaint. Therefore, it would be unreasonable for Rodgers to rely on Aldridge's statements that a contract between his clients and Rodgers existed.

An overarching issue, however, is whether all of these claims are barred by the settlement agreement signed on May 1, 2008 and incorporated into the 2008 and 2009 Orders issued by Judge Fox. The court next addresses whether the general release in the settlement agreement applies to the claims against Aldridge. Resolving this issue will also put an end to Rodgers' continued attempts to skirt the effect of the settlement agreement and the rulings of the state court. The settlement agreement, which was drafted as a result of the court-mandated mediation, states that upon completion of the conditions stated (see supra Procedural History para. 6), the parties are to file stipulations of dismissal of all claims and counterclaims in the action with prejudice. It next states "Mutual release to be executed by all parties." The hand-written settlement agreement is signed by the Eichorns, Aldridge, Allen, PCR, PCR's attorney, Toth, Toth's attorney, Rodgers, and Rodgers' attorney.

North Carolina law favors settlement of disputes out of court. Penn Dixie Lines, Inc. v. Grannick, 238 N.C. 552, 557 (1953). Agreements such as mediated settlement agreements are governed by general principles of contract law. Chappell v. Roth, 353 N.C. 690, 692 (2001) (citations omitted). There is a strong presumption that agreements made pursuant to court-ordered mediation serve to minimize time and money spent by litigants and the superior courts. N.C. Gen. Stat. § 7A-38.1(a). The settlement agreement at issue is a valid agreement, as it is in writing and signed by the parties as required by North Carolina General Statute § 7A-38.1(l). Rodgers has submitted arguments to this court throughout the adversary proceeding that he signed the agreement under duress; however, Rodgers had numerous opportunities to make this argument before the state court. This argument would have been addressed after the Eichorns filed the first motion to compel and enforce the settlement agreement on May 9, 2008, on appeal

of the order enforcing the agreement to the North Carolina Court of Appeals, after the second motion to enforce the settlement agreement on May 13, 2009, and on hearing Rodgers' Rule 60 motion for relief from the 2008 Order enforcing the settlement agreement and Rule 59(a) motion to strike the 2009 Order enforcing the settlement agreement. At each juncture the state courts have or could have heard the duress argument and rejected it.

While the "mutual release to be executed by all parties" clearly applies to any claims Rodgers might have against the Eichorns, the question remains as to whether it applies to claims against Aldridge, their agent and employed counsel. A general release is the broadest form of release and releases any and all claims that have accrued as of the date of the release. SOFCO, LLC v. National Bank of Kansas City, 2010 WL 3039567, at *4 (D. Kan. Aug. 3, 2010) (citing 29 Williston on Contracts § 73.4 (4th ed.)). It is common for release clauses to include not only the parties involved but their agents, employees, successors, and assigns. The clause at issue does not include such language.

North Carolina law does not explicitly state whether the release of a principal, such as the Eichorns, impliedly includes the release of their agent from liability. It does provide that an agent may not be held liable by a third person for acts done in the scope of his authority for a disclosed principal. See In re Tetterton, 379 B.R. 595, 600 (Bankr. E.D.N.C. 2007) (citing Walston v. R. B. Whitley & Co., 226 N.C. 537, 540 (1946)). The filing of the Notice of Lis Pendens and complaint, the actions taken during the prosecution of the complaint, as well as the persistence in the supposedly nonjusticiable claims that allegedly led to infliction of emotional distress, were actions taken by Aldridge, an agent, at the behest of the principals, the Eichorns. Interpreting the release clause in its narrowest form, Rodgers agreed to release these claims,

-14-

which accrued prior to the date of execution of the settlement agreement, against the Eichorns, who are ultimately responsible for Aldridge's acts taken within the scope of his agency.

Under a broader and more appropriate interpretation of the release clause, given the law's preference for efficient settlement of disputes, the majority view is that a valid release of either master or servant from liability for tort operates to release the other. Ericksen v. Pearson, 211 Neb. 466, 478-79 (1982) (citing Geib v. Slater, 320 Mich. 316 (1948); Drinkard v. William Pulte Inc., 48 Mich. App. 67 (1973); Lackey v. Brooks, Adm'r, 204 Va. 428 (1963); Mayfair Fabrics v. Henley, 101 N.J. Super. 363 (1968); Mid-Continent Pipeline Co. v. Crauthers, 267 P.2d 568 (Okl. 1954); Spradley v. McCrackin, 505 S.W.2d 955 (Tex. Civ. App. 1974); Smith v. Lincoln, 52 Misc.2d. 66, 275 N.Y.S.2d 74 (1966)). This proposition applies where the theory of liability is based upon the doctrine of respondeat superior. In addition to being an agent of the Eichorns, Aldridge is employed by them. See, e.g., Pakulski v. Garber, 6 Ohio St.3d 252, 256 (1983) (describing law firm as agents and employees of the named releasees in a settlement agreement).

Public policy supports this result. The finality of mediated settlements would be severely undercut if the participants in a lawsuit who agreed to settle and release all claims are then free to sue opposing counsel for their conduct in litigation.

## CONCLUSION

The court finds the four claims against the defendants are dismissed on their merits. Moreover, the claims are barred by the settlement agreement signed by the defendants and their principals. The settlement agreement released the principals of liability, which thereby releases the agent of liability for actions taken within the scope of his agency.

Based on the foregoing, the defendants' motion for judgment on the pleadings is

GRANTED.

**END OF DOCUMENT**